RENDERED: JANUARY 21, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0191-DE

M.C.                                                                                      APPELLANT


ON REVIEW FROM COURT OF APPEALS
v.                              NO. 19-CA-1395
CALLOWAY CIRCUIT COURT NO. 17-J-0105-005


COMMONWEALTH OF KENTUCKY,                                              APPELLEE
CABINET FOR HEALTH AND FAMILY
SERVICES; COMMONWEALTH OF
KENTUCKY, CALLOWAY COUNTY; L.C.,
DECEASED MOTHER OF MINOR CHILD;
AND S.C., A MINOR CHILD


AND


NO. 2020-SC-0192-DE


M.C.                                                                                      APPELLANT


ON REVIEW FROM COURT OF APPEALS
v.                              NO. 19-CA-1399
CALLOWAY CIRCUIT COURT NO. 17-J-0106-005


COMMONWEALTH OF KENTUCKY,                                              APPELLEE
CABINET FOR HEALTH AND FAMILY
SERVICES; COMMONWEALTH OF
KENTUCKY, CALLOWAY COUNTY; L.C.,
DECEASED MOTHER OF MINOR CHILD;
AND B.C., A MINOR CHILD


AND

C.C.                                                                                          APPELLANT

                              ON REVIEW FROM COURT OF APPEALS
V.                                          NO. 19-CA-1400
                       CALLOWAY CIRCUIT COURT NO. 17-J-0104-005

COMMONWEALTH OF KENTUCKY,                                                APPELLEE
CABINET FOR HEALTH AND FAMILY
SERVICES; COMMONWEALTH OF
KENTUCKY, CALLOWAY COUNTY; L.C.,
DECEASED MOTHER OF MINOR CHILD;
AND C.C., A MINOR CHILD

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>REVERSING AND VACATING</u>**

M.C. appeals a decision of the Court of Appeals that affirmed the

Calloway Family Court's finding of neglect against M.C. regarding his three

teenaged children.  After review, we reverse the Court of Appeals and vacate the

family court's orders.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The appellant in this case, M.C.,[1] is the father of three children: twins

B.C. and S.C. who were born on October 31, 2005, and C.C. who was born on

December 1, 2003.  Sadly, the children's mother, L.C., passed away during the

---

[1] This case is under a court order of confidentiality.  The parents and children
will therefore be referred to by their initials.

pendency of this case at the Court of Appeals. M.C. and L.C. were divorced during the relevant time periods discussed herein.

The Cabinet became involved with this family for the first time in July of 2017 with its filing of a petition against the mother. As we will discuss in more detail below, that court case was ultimately closed and is therefore not at issue here. But, because of our family court system's "one judge one family" policy, we feel a brief discussion of that case is important to the case at bar. The same judge presided over both cases, and the prior case was certainly considered by that judge when ruling in the case before us. While these cases have the 2017 case number, the parties did not designate the original cases as part of the record here. Our information was gleaned from the Cabinet's Dispositional Report in this case, trailer number five for each child.

In July of 2017, L.C. had custody of the children. The Cabinet received reports that L.C. was drinking alcohol while in a caregiving role for the children. The Cabinet removed the children from L.C.'s care and placed them with M.C. while it worked with L.C. to address her alcohol use.

M.C. agreed to a case plan with the Cabinet that prohibited the children from having unsupervised visits with L.C. M.C. also agreed to abstain from alcohol consumption. In December of 2017, the Cabinet removed the children from M.C.'s care, asserting that M.C. had allowed unsupervised visitation between the children and L.C. and had consumed alcohol in his home around the children.

3

The Cabinet placed them with their paternal grandmother. Their grandmother agreed not to allow any unsupervised visits between the children and either parent. On March 28, 2018, the Cabinet removed the children from their grandmother's care after she allowed them to stay with M.C., unsupervised, for two nights. In addition, there was an incident during which the grandmother told the children that she did not want them and smashed B.C.'s cellphone with a hammer in the children's presence. The children were placed in the Cabinet's custody on April 2, 2018 and placed with a foster family.

After the children were placed in the Cabinet's custody, L.C. and M.C. began working their respective case plans with the Cabinet. L.C.'s progress was minimal, and she eventually stopped cooperating with the Cabinet altogether. L.C. refused to participate in an intensive outpatient program (IOP) or an inpatient program to address her alcohol use and did not comply with drug screens or breathalyzers requested by the Cabinet. She also failed to meet with the social service worker (SSW) on the case from August 2018 to May 2019. She did not see the children in person from August 2018 to May 2019, though she would call the children. The phone calls were reported to be sporadic and strange, and L.C. would sometimes become emotional and say things that did not make sense.

In contrast, M.C. cooperated with the Cabinet and made significant progress on his case plan. He had supervised visits with the children that reportedly went well. He also attended substance use and mental health

4

counseling regularly at Four Rivers Behavioral Health (Four Rivers), and his sessions there went well with few concerns from his therapist. The goal of reunification was stalled when M.C. got a job in Georgia, but he returned to Kentucky in December 2018, with hopes of regaining custody of his children. M.C. continued to work his case plan, and the children were returned to him on March 22, 2019.

This brings us to the case now before us. When the children were returned to M.C. on March 22, 2019, the 2017 DNA[2] case was closed with the condition that M.C. cooperate with the Cabinet. The Cabinet left its case open in order to continue working M.C.'s case plan. A copy of the case plan agreed to by M.C. at that time was not included in the record, but it appears that it imposed at least three conditions on M.C.: that he would attend A.A., that he would not allow unsupervised visits between the children and their grandmother, and that he would not be under the influence of alcohol while in a caretaking role or in the presence of the children.

Andrea Fox, the SSW on the case, was contacted on the evening of April 17, 2019, by either the children's CASA[3] worker or the children's former foster mother about M.C. possibly drinking around the children. On April 19th, Ms. Fox went to M.C.'s home to speak with him. According to Ms. Fox, M.C. told her that he was struggling with his sobriety. At that point Ms. Fox gave M.C. an ultimatum: either he stopped drinking and attend an IOP or she would file a

---

[2] Dependency, neglect, or abuse.

[3] Court Appointed Special Advocate.

petition to have the children removed. Ms. Fox also told him that it was very likely the permanency goal for the children would be changed to adoption due to their time in the Cabinet's care. M.C. told her he would not attend an IOP as he has always maintained that, while he drinks, it does not have an effect on his ability to parent and care for his children.

Ms. Fox filed a DNA petition on April 23, 2019, and the children were removed from M.C.'s home via an emergency custody petition filed the same day. Additionally, because M.C. denied the neglect and refused to sign the prevention plan, his visitation with the children was suspended by the Cabinet. The family court granted the emergency custody petition on the grounds that "[t]he [children were] in danger of imminent death or serious physical injury or [were] being sexually abused." The children were then placed with the same foster family they had been with previously.

At the adjudication hearing on July 29, 2019, the Cabinet called one of the twins, B.C., to testify regarding the children's time in M.C.'s care prior to their removal. B.C., then age thirteen, was the only child to testify. He said that he was glad he was placed back with M.C. B.C. was unsure if M.C. began drinking immediately after they were returned to him, but he knew M.C. was drinking by about week two or three. He could not say whether M.C. was drinking every night.

B.C. said that he never saw M.C. drink but knew when he was drinking from the way his eyes looked and the slight slur he would get. B.C. said he would also sometimes say strange things; the example B.C. gave was that M.C.

6

would talk about things that happened when B.C. was a baby. M.C. had no trouble walking when he was drinking and did not stumble or fall down. In addition, M.C. never drank in the morning or during the day and he did not drink inside the home. M.C. would only drink in the evening after dinner on the back deck. B.C. would get home late because he had track practice after school and football practice after that. Because of his schedule, they typically ate dinner late, between about 7 and 9 pm. M.C. would cook dinner for them, and after they were done eating M.C. would go out on the back deck for about an hour and drink standard sized cans of beer. B.C. did not know how many beers M.C. drank, and M.C. always threw his beer cans away. When M.C. was done on the back deck, he would come inside, say goodnight to the children, and go to bed. On school days, M.C. would get the children up in the morning for school, and M.C. would either drive them to school or they would walk. In addition, each child had a household chore they were responsible for that changed from time to time.

When B.C. was asked how the children felt about M.C.'s drinking, he said that he and his older brother C.C. are not bothered by it. However, his twin sister S.C. got upset by it. Occasionally, it led to verbal arguments between S.C. and M.C.

Ms. Fox testified that the children were not missing any school while in M.C.'s care, that they have always excelled in school, and she had no concerns about how they were doing in school. She also had no concerns about them being properly fed, clothed, or otherwise provided for. She said that when she

visited M.C. at his home on April 19 it was "extremely cluttered" but not dirty. She did not observe anything in the home that was a threat to the children's health or well-being.

On April 16, three days prior to Ms. Fox's visit to M.C.'s home, Murray Police Officer Alyssa Finnegan went to the home at 9:10 p.m. to conduct a welfare check on the children. There was no evidence as to who requested the welfare check. M.C. let Ofc. Finnegan into the house and spoke with her for a couple of minutes. Ofc. Finnegan testified that she did not smell or see any alcohol, that M.C. did not appear impaired, and that he answered all of her questions fully and appropriately. B.C. and C.C. were at home that evening, but S.C. was at a friend's house. Ofc. Finnegan spoke to B.C. and C.C. out of M.C.'s presence. She said they were not in distress and she had no concerns for their well-being. She did not recall the house being cluttered or dirty.

Ofc. Finnegan then went to speak with S.C. at her friend's house. S.C. was visibly upset and crying but other than that she was fine. S.C. told her that M.C. had been drinking a beer and smoking, S.C. told him he was a bad influence, and they got into a verbal argument. S.C. thereafter asked M.C. if she could stay at a friend's house and he agreed.

Following the adjudication hearing the family court issued its adjudication order. In it, the court made the following findings of fact:

> The Court finds reasonable cause to believe the
> [children are] neglected based on father's continued
> alcohol use. The father signed a prevention plan with
> the Cabinet that he would not be under the influence
> of alcohol while in the care-giving role and the children

8

> reported to the Cabinet worker that the father's
> drinking has continued to get worse.

In its conclusions of law, the court found that the children were neglected under KRS[4] 600.020(1)(a)2, 3, 4, and 8, and found that there were no less restrictive means than removal because "[t]he father has refused to stop drinking and has refused to enter intensive out patient (sic) rehab as advised by Four Rivers. The father is unwilling to address his substance abuse issues."

In the family court's subsequent disposition hearing order, it adopted the recommendations of CASA and the Cabinet to change the permanency goal to adoption and to waive reasonable efforts by the Cabinet towards reunification with either parent. It found that there were no less restrictive alternatives to removal because "[t]he Cabinet [had] worked with the parents since July 2017, and little to no progress [had] been made by the parents." Orders granting the waiver of reasonable efforts by the Cabinet and changing the permanency goal to adoption were entered the same day.

M.C. appealed the family court's decision to the Court of Appeals, which affirmed. After thorough review, we reverse and vacate the family court's finding of neglect.

Additional facts are discussed below as necessary.

---

[4] Kentucky Revised Statute.

9

## II.   ANALYSIS

### A. Preservation

Under KRS 610.080, DNA actions are bifurcated proceedings, i.e., they involve two distinct hearings: adjudication and disposition.  The adjudication determines the truth or falsity of the allegations in the DNA petition,[5] while the disposition determines the action to be taken by the court on behalf of the child or children.[6]  The rights of all parties to a DNA action are not fully adjudicated for the purposes of appellate review until both the adjudication and disposition hearings have been completed.[7]  Accordingly, "a disposition order, not an adjudication order, is the final appealable order with regard to a decision of whether a child is dependent, neglected, or abused."[8]

In this case, M.C. initially filed his appeal from the adjudication order, which would have otherwise rendered his appeal interlocutory and therefore improper.  However, as the Court of Appeals noted, M.C. subsequently filed a curative notice of appeal to remedy his premature appeal.[9]  Because the adjudication and disposition hearings were completed and because M.C. filed a curative notice of appeal, we elect to proceed with review of this case.  We

---

[5] KRS 620.100(3).

[6] KRS 620.100(4).

[7] *See J.E. v. Cabinet for Health & Fam. Servs.*, 553 S.W.3d 850, 852 (Ky. App. 2018).

[8] *Id.* at 853.  *See also B.S.S. v. K.S.*, 599 S.W.3d 858, 864 (Ky. 2020).

[9] *M.C. v. Cabinet for Health & Fam. Servs.*, 2019-CA-001395-ME, 2020 WL 1815981, at *3 n.4 (Ky. App. Apr. 10, 2020).

10

reiterate for the benefit of future litigants that parties to a DNA action should file their notice of appeal from the disposition order, not the adjudication order.

## B. Standard of Review

In this case, the Cabinet bore the burden of proving that the children were neglected by M.C. by a preponderance of the evidence.[10] In other words, that it was more likely than not that they were neglected.[11] A family court's findings of fact in a DNA action "shall not be set aside unless clearly erroneous."[12] "A finding of fact is clearly erroneous if it is not supported by substantial evidence, which is evidence sufficient to induce conviction in the mind of a reasonable person."[13] If the family court's findings of fact were supported by substantial evidence, and it applied the correct law, its decision will not be disturbed absent an abuse of discretion.[14] An abuse of discretion occurs when "the family court's decision is unreasonable or unfair."[15] "Thus, in reviewing the decision of the family court, the test is not whether the appellate court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion."[16] As the facts of this case are largely

---

[10] *See* KRS 620.100(3).

[11] *See, e.g.*, *Ashley v. Ashley*, 520 S.W.3d 400, 404 (Ky. App. 2017).

[12] *See* Kentucky Rule of Civil Procedure (CR) 52.01.

[13] *B.C. v. B.T.*, 182 S.W.3d 213, 219 (Ky. App. 2005).

[14] *Id.*

[15] *Id.*

[16] *Id.* at 219-20.

undisputed, we granted discretionary review to determine whether the trial court abused its discretion when it found the children in this case to be neglected.

As with any case involving state interference with a parent's fundamental constitutional right to raise their children,[17] there are other considerations of which we must also be mindful. Specifically, that "[w]hile the state has a compelling interest to protect its youngest citizens, state intervention into the family with the result of permanently severing the relationship between parent and child must be done with utmost caution. It is a very serious matter."[18] The foundation of our Unified Juvenile Code is to serve the best interests of the child.[19] And it is the policy of this Commonwealth that the best interests of the child are best served by keeping them with their biological parents, when possible. To that end, KRS 600.010 provides in pertinent part:

> (2) KRS Chapters 600 to 645 shall be interpreted to effectuate the following express legislative purposes:
>
>> (a) The Commonwealth shall direct its efforts... to the strengthening and encouragement of family life for the protection and care of children; to strengthening and **maintaining the biological family unit**;

---

[17] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.").

[18] *M.E.C. v. Commonwealth, Cabinet for Health & Fam. Servs.*, 254 S.W.3d 846, 851 (Ky. App. 2008) (citing *V.S. v. Commonwealth, Cabinet for Fam. Servs.*, 194 S.W.3d 331, 335 (Ky.App.2006)).

[19] *See generally* KRS Chapters 600 to 645.

> (c) The court shall show that other less
> restrictive alternatives have been attempted or
> are not feasible in order to insure (sic) that
> children are not removed from families **except
> when absolutely necessary**[.][20]

With these principles in mind, we now address the merits of this case.

## C. The family court's finding that M.C. neglected his children was an abuse of discretion.

As mentioned previously, the family court found that the children were neglected by M.C. under KRS 600.020(1)(a)2, 3, 4, and 8. Those statutory provisions state:

> (1) "Abused or neglected child" means a child whose
> health or welfare is harmed or threatened with harm
> when:
>
> (a) His or her parent, guardian, person in a
> position of authority or special trust, as defined in
> KRS 532.045, or other person exercising custodial
> control or supervision of the child:
>
> 2. Creates or allows to be created a risk of
> physical or emotional injury as defined in this
> section to the child by other than accidental
> means;
>
> 3. Engages in a pattern of conduct that renders
> the parent incapable of caring for the immediate
> and ongoing needs of the child, including but
> not limited to parental incapacity due to a
> substance use disorder as defined in KRS
> 222.005;
>
> 4. Continuously or repeatedly fails or refuses to
> provide essential parental care and protection
> for the child, considering the age of the child;

---

[20] (emphasis added).

13

8. Does not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being[.]

### i.) KRS 600.020(1)(a)2

In order to find that a child was neglected under the first subsection at issue, KRS 600.020(1)(a)2, the parent must create or allow to be created a risk of physical or emotional injury to the child by non-accidental means. A "physical injury," is "substantial physical pain or any impairment of physical condition."[21] An "emotional injury" is

> an injury to the mental or psychological capacity or emotional stability of a child as evidenced by a substantial and observable impairment in the child's ability to function within a normal range of performance and behavior with due regard to his or her age, development, culture, and environment as testified to by a qualified mental health professional[.][22]

By its express terms, KRS 600.020(1)(a)2 allows a finding of neglect when there has only been a risk of physical or emotional injury. It "permits the court's finding where a *risk of abuse exists* and *does not require actual abuse* prior to the child's removal from the home or limitation on the contact with an abusive parent."[23] However, "the risk of harm must be more than a mere

---

[21] KRS 600.020(49).

[22] KRS 600.020(26).

[23] *Cabinet for Health & Fam. Servs. Ex rel. C.R. v. C.B.*, 556 S.W.3d 568, 576 (Ky. 2018) (quoting *Z.T. v. M.T.,* 258 S.W.3d 31, 36 (Ky. App. 2008)).

theoretical possibility," it must be "an actual and reasonable potential for harm."[24]

The Court of Appeals relied heavily on a recent case of this Court, *Cabinet for Health and Family Servs. on behalf of C.R. v. C.B.*,[25] to support its holding that there was sufficient evidence of risk of physical or emotional injury to support a finding of neglect in this case. But *C.B.* is readily distinguishable from the case now before us.

In *C.B.*, the Cabinet filed a DNA petition against a newborn's mother and father because the baby was born with Suboxone in its system and had several birth defects.[26] Two months before the baby's birth the father began attending a Suboxone clinic, and admitted to using heroin, Percocet, and off-street Suboxone on his intake form.[27] The father had previously had a termination of parental rights (TPR) for other children due to his substance use.[28]

After the Cabinet filed its DNA petition, the father agreed to work a case plan requiring that he call the Cabinet three times a week for random drug screens and report at a designated time if required to take one, continue attending his Suboxone clinic, and take all medications only as prescribed.[29] At the adjudication hearing on the petition the Cabinet presented evidence that

---

[24] *K.H. v. Cabinet for Health and Family Servs.*, 358 S.W.3d 29, 32 (Ky. App. 2011).

[25] 556 S.W.3d at 568.

[26] *Id.* at 570.

[27] *Id.*

[28] *Id.*

[29] *Id.*

the father called the Cabinet as required during the early stages of his case plan.[30]  However, he tested positive for Gabapentin (Neurontin) on three separate occasions, a drug for which he did not have a prescription.[31]  He also continued to test positive for Suboxone for which he likewise did not have a prescription.[32]  In addition, he failed to call the Cabinet for testing on several occasions and left before providing a sample on two occasions.[33]

The father testified that he had never taken Gabapentin and presented drug screens from his Suboxone clinic taken on consecutive days to that of the Cabinet's that did not show the presence of Gabapentin.[34]  The father admitted to "stretching out" his old Suboxone prescription to avoid withdrawal sickness, but he did not have a prescription for Suboxone at that time.[35]  Finally, he testified that the children from his previous termination of parental rights case were not his, but the documents from that case noted no objection to the paternity of the children.[36]  The circuit court found that the child was neglected by the father due to the risk of harm associated with his substance use issues.[37]  The Court of Appeals reversed and held, in pertinent part, that the

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.* at 570-71.

[35] *Id.* at 571.

[36] *Id.*

[37] *Id.*

Cabinet's evidence was speculative and did not rise to the level of a preponderance of the evidence.[38]

This Court subsequently granted discretionary review and held that the evidence was sufficient to support a finding of neglect via a risk of harm.[39] In particular, the Court pointed to the fact that the father's "history of drug abuse was found to have created a risk of harm in the prior TPR proceeding."[40] And, that he continued to test positive for drugs for which he did not have a prescription, which suggested his drug issues were still not resolved.[41] Accordingly, it reversed the Court of Appeals and reinstated the circuit court's order.[42]

The first factor that distinguishes this case from *C.B.* was completely overlooked by the Court of Appeals in its analysis: the age of the children. In *C.B.,* the child was a newborn. It goes without saying that newborns need a parent's undivided attention and care nearly twenty-four hours a day. Consequently, the probability that harm may come to them due to a parent's substance use is automatically very high. But at the time of the underlying facts in this case the twins B.C. and S.C. were thirteen years old, while the oldest child C.C. was fifteen years old. And, as of the writing of this opinion, they are fifteen and seventeen years old, respectively. They are all reportedly

---

[38] *Id.*

[39] *Id.* at 574.

[40] *Id.* at 576.

[41] *Id.*

[42] *Id.*

very bright, academically successful and capable children.  There was no evidence that any of them have any special needs.

Further, the evidence was uncontroverted that M.C. was providing appropriate care to his children.  M.C. cooked them dinner frequently, if not every night, made sure the children did their chores, and got them up for and took them to school.  The Cabinet worker in this case, Ms. Fox, testified that she had no concerns about the children's performance or attendance at school and had no concerns about them being properly fed, clothed, or otherwise provided for.  She saw nothing in the home that was a threat to the children's health or well-being.  There was no evidence that M.C. ever drank during the day or to the point of stumbling around or passing out while the children were in his care.

We believe the ages of the children are a key distinguishing factor against a finding of risk of harm under the facts of this case.  However, we feel it is important to make clear that we are not holding that children of an advanced age categorically cannot be subjected to a risk of harm or neglect due to a parent's substance use.

Another distinguishing factor in this case is that the child in *C.B.* had already suffered real harm due to her parent's substance use: she was born with Suboxone in her system and was born with several birth defects that were presumably due to her mother's drug use during her pregnancy.  Granted, it was the mother's drug use that caused this harm.  But the mother and father were in a relationship and both were drug users.  This also supported the

18

circuit court's finding in that case that the baby was at a risk of harm due to her father's substance use.

Here, there was no evidence of any kind that M.C.'s children were at a risk of a physical or emotional injury.  Regarding a risk of physical injury, it was never alleged that he would become aggressive or violent toward his children when he drank or that they ever suffered a physical injury due to M.C.'s drinking.  Regarding emotional injury, there was evidence that S.C. would become upset by M.C.'s drinking and they would have verbal arguments. But there was no suggestion that she "suffered an injury to [her] mental or psychological capacity or emotional stability [as evidenced] by a substantial and observable impairment of [her] ability to function."[43]

Finally, the father in *C.B.* had previously had his parental rights to other children terminated due to his substance use.  M.C. has never had his parental rights terminated due to his drinking, though we acknowledge the children had previously been removed from his care for drinking and allowing the children to have unsupervised visits with their mother.

Instead, we feel that *K.H. v. Cabinet for Health and Family Services* is more applicable.[44]  In *K.H.*, the biological mother and father lived together and had two children, a four year old and an eight year old.[45]  Following an investigation, the Cabinet and the Kentucky State Police substantiated a sexual

---

[43] KRS 600.020(26) (defining "emotional injury").

[44] 358 S.W.3d 29 (Ky. App. 2011).

[45] *Id.* at 29.

abuse allegation by the children's twelve year old cousin against their father.[46] After the substantiation, the Cabinet wanted the mother to sign an aftercare plan wherein she would agree not to allow the father to be alone with the children or allow him to bathe the children or change their clothing or diapers.[47] The mother refused citing her skepticism of the cousin's allegation and her belief that the father was not a danger to the children.[48]

The Cabinet filed a DNA petition against the mother based solely on her refusal to sign the aftercare plan.[49] It argued that her refusal to sign the aftercare plan exposed the children to a risk of sexual abuse from their father which amounted to neglect.[50] The family court agreed and affirmed the neglect charges against the mother.[51] In particular, the court found that the mother had information about a risk of harm to the children from their father and failed to protect the children from that risk by refusing to agree to the aftercare plan.[52] The court ordered that the children remain in the home, but that their father could not live there or have unsupervised contact with the children.[53]

In the subsequent appeal, the sole issue addressed by the Court of Appeals was whether the Cabinet presented sufficient evidence to show that

---

[46] *Id.* at 30.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

the mother neglected the children.[54]  It noted that it did not doubt the Cabinet's good-faith desire to protect the children from possible sexual abuse, but that it was "concerned about the breadth of the authority which the Cabinet [was] asserting."[55]  Specifically, there had been no allegation that the father ever sexually abused his children, and the Cabinet conceded that the mother was a good and fit parent and that the children were cared for properly.[56]  Yet the Cabinet asserted that the mother's refusal to sign the aftercare plan, alone, constituted neglect.[57]  Of particular interest to the case now at bar, the court stated:

> [t]he Cabinet's position opens the door to a potentially wide-reaching intrusion by the state into the parent-child relationship.  **If the Cabinet can show that [the mother] neglected her children merely by refusing to follow the Cabinet's recommendations, then it could also seek to enforce other views about proper parenting in a similar manner**…when the Cabinet seeks to compel a parent to comply with its directives, the courts must be vigilant to protect against overreaching of that authority.  **It is not enough for the Cabinet to show that [the mother] would be well-advised to agree to the terms of the Aftercare Plan**.  The applicable statutory definition requires a finding that [the mother] created or allowed to be created a risk that an act of sexual abuse will be committed upon the children.[58]

---

[54] *Id.*

[55] *Id.* at 31.

[56] *Id.* at 31-33.

[57] *Id.* at 31.

[58] *Id.* (emphasis added).

21

And, as we have mentioned previously, that "risk of harm must be more than a mere theoretical possibility, but an actual and reasonable potential for harm."[59] Without that requirement, "the Cabinet could subject [a parent to] a finding of neglect based only on [his or her] refusal to comply with its recommendations."[60] The Court of Appeals accordingly reversed the family court's finding of neglect against the mother.[61]

Here, the only allegation against M.C. is that he continued to drink against the Cabinet's wishes. But there was simply no evidence to support a finding that his drinking subjected his children to "an actual and reasonable potential for harm."[62] The children were by all accounts cared for and provided for properly by M.C. and his drinking did not interfere with that care. We therefore hold that the family court's finding that M.C. neglected his children under KRS 600.020(1)(a)2 was an abuse of discretion.

## ii.) KRS 600.020(1)(a)3

Under the second subsection at issue, KRS 600.020(1)(a)3, a parent neglects a child if he "[e]ngages in a pattern of conduct that renders the parent incapable of caring for the immediate and ongoing needs of the child, including but not limited to parental incapacity due to a substance use disorder as

---

[59] *Id.* at 32.

[60] *Id.*

[61] *Id.* at 33.

[62] *Id.* at 32.

defined in KRS 222.005." And, under KRS 620.023(1)(c), the family court was required to consider "[s]ubstance use disorder, as defined in KRS 222.005, that results in an incapacity by the parent or caretaker to provide essential care and protection for the child," given its relevance in this case. Both statutes reference KRS 222.005 for the definition of a substance use disorder. KRS 222.005(12), in turn, refers to "the most current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders [DSM-V]," for the criteria of a substance use disorder.

As it relates to alcohol, the DSM-V's diagnostic criteria for a substance use disorder are:

> A. A problematic pattern of alcohol use leading to clinically significant impairment or distress, as manifested by at least two of the following, occurring within a 12-month period:
>
> 1. Alcohol is often taken in larger amounts or over a longer period than was intended.
>
> 2. There is a persistent desire or unsuccessful effects to cut down or control alcohol use.
>
> 3. A great deal of time is spent in activities necessary to obtain alcohol, use alcohol, or recover from its effects.
>
> 4. Craving, or a strong desire or urge to use alcohol.
>
> 5. Recurrent alcohol use resulting in a failure to fulfill major role obligations at work, school, or home.
>
> 6. Continued alcohol use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of alcohol.

23

7. Important social, occupational, or recreational activities are given up or reduced because of alcohol use.

8. Recurrent alcohol use in situations in which it is physically hazardous.

9. Alcohol use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by alcohol.

10. Tolerance, as defined by either of the following:

    a. A need for markedly increased amounts of alcohol to achieve intoxication or desired effect.

    b. A markedly diminished effect with continued use of the same amount of alcohol.

11. Withdrawal, as manifested by either of the following:

    a. The characteristic withdrawal syndrome for alcohol (refer to Criteria A and B of the criteria set for alcohol withdrawal, pp. 499-500).

    b. Alcohol (or a closely related substance, such as a benzodiazepine) is taken to relieve or avoid withdrawal symptoms.

The DSM-V then provides for a consideration of the severity of the alcohol use disorder. The presence of two to three of the foregoing criteria is "mild," four to five is "moderate," and the presence of six or more is "severe."[63]

---

[63] American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed., 2013).

There was evidence presented at the adjudication hearing that M.C. had recently met the criteria for substance use disorder. Reports from M.C.'s counseling sessions at Four Rivers, dated from November 30, 2018, to May 3, 2019, were entered into evidence. One of those reports was an annual psychosocial evaluation conducted on April 10, 2019, a little over three months before the adjudication hearing on July 29, 2019. The evaluation states that M.C.'s "presenting problem" was "SUD, based on reports of: spending a lot of [time] on gaining [alcohol], cravings in the past and present, high tolerance, [and] use despite negative consequences." Therefore, the family court had sufficient evidence to find that M.C. had a mild to moderate substance use disorder. But that was only the first prong of what is necessarily a two-part inquiry.

KRS 600.020(1)(a)4 requires that a parent's substance use disorder "**renders the parent incapable of caring for the immediate and ongoing needs of the child**."[64] Likewise, the required consideration by the family court under KRS 620.023(1)(c) is substance use disorder "**that results in an incapacity by the parent or caretaker to provide essential care and protection for the child**[.]"[65] Therefore, by the express language of two different statutes, it is not enough that M.C. had a substance use disorder. That substance use disorder had to render him incapable of providing proper

---

[64] (emphasis added).

[65] (emphasis added).

care to his children in order for the family court to find that he neglected his children under KRS 600.020(1)(a)3.

There was no evidence presented in this case that M.C.'s substance use disorder rendered him incapable of caring for his children or meeting their needs. As discussed supra, there was no evidence that M.C. was failing to properly care for the children, and the Cabinet conceded it had no concerns that M.C. was not meeting their needs or caring for them. The family court's finding of neglect against M.C. under KRS 600.020(1)(a)4 was therefore an abuse of discretion.

**iii.**) **KRS 600.020(1)(a)4 and 8**

Finally, due to the similarities of their language, we will address the final subsections, KRS 600.020(1)(a)4 and 8, together. Those subsections allow for a family court to find a parent has neglected a child if that parent either "[c]ontinuously or repeatedly fails or refuses to provide essential parental care and protection for the child, considering the age of the child,"[66] or "does not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being."[67] Tellingly, the Cabinet's brief to this Court is entirely silent as to the family court's findings under these provisions. That omission is likely due to the fact that no reasonable argument could be made that M.C. in any way neglected his children under either provision.

---

[66] KRS 600.020(1)(a)4.

[67] KRS 600.020(1)(a)8.

26

As we have discussed, the children were thirteen and fifteen years old, respectively, during the relevant period and were largely capable of looking after themselves. Even so, the evidence was uncontroverted that M.C. provided the kind of care discussed by the aforementioned statutory provisions. Again, Ms. Fox testified that she was not concerned with how the children were doing in school, they were not missing school, and continued to excel in school. In that vein, B.C. testified that M.C. got the children up in the morning for school and typically drove them there. Ms. Fox also stated that she had no concerns about the children being properly clothed, fed, or otherwise provided for. Ms. Fox's only point of concern, apart from M.C.'s drinking, was that M.C.'s home was "cluttered." But cluttered, of course, does not necessarily mean dirty and Ms. Fox could not say that the house was dirty. Indeed, she stated that she did not see anything in the home that was a threat to the children's health or well-being. And Ofc. Finnegan, who was in the home just three days prior to Ms. Fox, testified that she did not remember the home being cluttered or dirty.

Accordingly, the family court's finding that M.C. neglected his children under KRS 600.020(1)(a)4 and 8, respectively, was an abuse of discretion.

As a final point of discussion, no future appellant shall be permitted to cite this Opinion to argue that parents are free to ignore or refuse to follow their agreed upon case plans with the Cabinet. That is not our intention. Rather, the basis for this decision is that, while substance use by a parent is an extremely serious matter that we do not take lightly, we simply cannot

27

affirm a finding of neglect when there has been no harm or actual, reasonable risk of harm to a child. We agree that M.C. would be well-advised to continue to seek substance use treatment, but in the record before us there is no justification to find that he neglected his children, let alone to waive reasonable efforts at reunification with his children and change their permanency goal to adoption. Every parent has the fundamental constitutional right to raise their children, a right reflected in this Commonwealth's policy of not removing children from their biological parents "except when absolutely necessary[.]"[68] This Court sees no such necessity in this case.

### III. CONCLUSION

Based on the foregoing, the family court's orders finding M.C. neglected B.C., S.C, and C.C. are vacated, and the petitions are dismissed. The children shall be immediately returned to the custody and care of M.C. absent the filing of a new petition which alleges that he is presently unfit to care for them.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Christopher Earl Hendricks
Hendricks Law Office

COUNSEL FOR APPELLEE:

Casey Jon Naber
Assistant Calloway County Attorney

Whitney Schroeder Jones

---

[68] KRS 600.010(2)(c).